IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHANIE ROSALES, on behalf of herself and others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:18-CV-00356-B |
| EQUINOX HOLDINGS, INC., | § § § | |
| Defendant. | § | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S FIRST STAGE MOTION
FOR NOTICE TO POTENTIAL PLAINTIFFS & CONDITIONAL CERTIFICATION**

Talley R. Parker
State Bar No. 24065872
talley.parker@jacksonlewis.com
Ethan J. Davis
State Bar No. 24107748
ethan.davis@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH: (214) 520-2400
FX: (214) 520-2008

**ATTORNEYS FOR DEFENDANT
EQUINOX HOLDINGS, INC.**

## <u>TABLE OF CONTENTS</u>

I.   FACTUAL BACKGROUND………………………………………………………..2

   A.   Equinox's Business................................................................................... 2

   B.   Personal Trainers' Activities.................................................................. 3

   C.   Equinox's Compensation And Work Schedule Policies For Personal Trainers..... 5

      1.   Personal Trainer Hourly Wages.................................................... 5

      2.   Personal Trainer Flat Rates.......................................................... 6

      3.   Personal Trainer Bonuses. ........................................................... 7

      4.   Timekeeping Policies. .................................................................. 8

   D.   Rosales's Employment With Equinox. .................................................. 8

   E.   Seaman's Employment With Equinox.................................................... 9

II.   ARGUMENT & AUTHORITIES .................................................................. 9

   A.   Legal Standard. ...................................................................................... 9

      1.   Conditional Certification Is Not Automatic................................ 10

      2.   The Stricter Second-Stage Analysis Applies Because Substantial Discovery Has Occurred. .......................................................... 11

   B.   Rosales Has Not Identified A Common Policy Or Plan That Violates The FLSA. ............................................................................................. 13

      1.   Equinox's Lawful Policies Require Personal Trainers To Accurately Record All Hours Worked.................................................................. 13

      2.   There Is No Evidence Of A Common "De Facto" Policy Or Practice That Violated The Law. .................................................................. 15

         a.   There is no evidence of any alleged "de facto" policy or practice common to the putative class...................................................... 15

         b.   There is no evidence that any alleged "de facto" policy or practice violated the FLSA...................................................... 17

         c.   Any non-compliance is the result of personal, individual decisions not to comply with Equinox's policies. ......................................... 19

         d.   Courts deny conditional certification in similar cases. ................. 21

   C.   The Putative Class Is Not Similarly Situated And The Required Inquiry Is Individualized. ...................................................................................... 22

      1.   The Substantial Individual Liability Determinations Render Collective Treatment Unmanageable. ....................................................... 22

      2.   Any Inquiry Into Unpaid Overtime Or Off-The-Clock Work Is Inherently Individualized. ....................................................................... 22

      3.   Neither Rosales Nor Seaman Can Offer Evidence Of Their Alleged Unpaid Overtime Or Off-The-Clock Hours To Determine Liability. .................. 25

D.      Rosales Lacks Support For Her Lawsuit. ............................................................ 26

E.      In The Event The Court Grants Rosales's Motion, It Should Reject The Proposed Notice. .......................................................................................................................... 27

III.     CONCLUSION .............................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acevedo v. Allsup's Convenience Stores, Inc.*,
    600 F.3d 516 (5th Cir. 2010) .................................................................10

*Aguirre v. SBC Communs., Inc.*,
    No. H-05-3198, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. Mar. 12, 2007) ..........................12

*Arceneaux v. Fitness Connection Option Holdings, LLC*,
    No. 4:16-cv-3418, 2017 U.S. Dist. LEXIS 194840 (S.D. Tex. Nov. 28, 2017) .....................12

*Barnes v. Abandonment Consulting Servs.*,
    No. 4:12-cv-01399, 2013 U.S. Dist. LEXIS 105702 (S.D. Tex. July 26, 2013) ..............11, 12

*Basco v. Wal-Mart Stores, Inc.*,
    No. 00-3184, 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 2, 2004) ....................................11

*Brumbelow v. Quality Mills, Inc.*,
    462 F.2d 1324 (5th Cir. 1972) ............................................................................14, 18

*Carey v. 24 Hour Fitness USA, Inc.*,
    Civ. A. No. H-10-2009, 2012 U.S. Dist. LEXIS 146471 (S.D. Tex. Oct. 11,
    2012) .................................................................................................21, 22, 26, 27

*Cherup v. Pittsburgh Plate Glass Co.*,
    350 F. Supp. 386 (W.D.W. Va. 1972) ...................................................................21

*Coca v. Big Bang Enters.*,
    No. 4:14-2122, 2015 U.S. Dist. LEXIS 187223 (S.D. Tex. Apr. 14, 2015)...............10, 11, 13

*H&R Block v. Housden*,
    186 F.R.D. 399 (E.D. Tex. 1999)...........................................................................11

*Harris v. Fee Transp. Servs., Inc.*,
    No. 3:05-cv-0077-P, 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15, 2006) ...................22

*Hoffmann-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989).............................................................................................10, 22

*Johnson v. TGF Precision Haircutters, Inc.*,
    No. H-03-3641, 2005 U.S. Dist. LEXIS 44259 (S.D. Tex. Aug. 17, 2005) ......................24, 25

*Lamon v. City of Shawnee, Kan.*,
    972 F.2d 1145 (10th Cir. 1992) .....................................................................19, 21

*Lindow v. United States*,
    738 F.2d 1057 (9th Cir. 1984) ...............................................................................21

*Longcrier v. HL-A Co., Inc.*,
595 F. Supp. 2d 1218 (S.D. Ala. 2008)...................................................................13

*Lusardi v. Xerox Corporation*,
118 F.R.D. 351 (D.N.J. 1987)..................................................................................10

*McKnight v. D. Houston, Inc.*,
756 F. Supp. 2d 794 (S.D. Tex. 2010) .....................................................................11

*Nieddu v. Lifetime Fitness, Inc.*,
977 F. Supp. 2d 686 (S.D. Tex. 2013) ..............................................................11, 15

*Pedigo v. 3003 S. Lamar, LLP*,
666 F. Supp. 2d 693 (W.D. Tex. 2009).....................................................................10

*Postiglione v. Crossmark, Inc.*,
No. 11-960, 2012 U.S. Dist. LEXIS 163615 (E.D. Pa. Nov. 15, 2012) ..................12

*Richardson v. Wells Fargo Bank, N.A.*,
No. 4:11-cv-00738, 2012 U.S. Dist. LEXIS 12911 (S.D. Tex. Feb. 2, 2012) .........18

*Rodgers v. CVS Pharmacy, Inc.*,
No. 8:05-cv-770-T-27MSS, 2006 U.S. Dist. LEXIS 23272 (M.D. Fla. Mar.
23, 2006) ..................................................................................................................26

*Russell v. Ill. Bell Tel. Co.*,
721 F. Supp. 2d 804 (N.D. Ill. 2010) .......................................................................22

*Songer v. Dillon Res., Inc.*,
569 F. Supp. 2d 703 (N.D. Tex. 2008) .....................................................................12

*Stiller v. Costco Wholesale Corp.*,
298 F.R.D. 611 (S.D. Cal. 2014) ..............................................................................14

*Torres v. CSK Auto, Inc.*,
No. EP-03-CA-113(KC), 2003 U.S. Dist. LEXIS 25092 (W.D. Tex. Dec. 17,
2003) ........................................................................................................................13

*Tussing v. Quality Res., Inc.*,
No. 8:08-cv-1833-T-26AEP, 2009 U.S. Dist. LEXIS 110190 (M.D. Fla. Nov.
25, 2009) ..................................................................................................................12

*Von Friewalde v. Boeing Aerospace Ops., Inc.*,
339 F. App'x 448 (5th Cir. 2009) .............................................................................18

*Walker v. Honghua Am., LLC*,
870 F. Supp. 2d 462 (S.D. Tex. 2012) ......................................................................10

*In re Wells Fargo Wage & Hour Empl. Practices Litig.*,
  No. H-1102266, 2013 U.S. Dist. LEXIS 70040 (S.D. Tex. May 17, 2013) ...........................28

*Wood v. Mid-America Mgmt. Corp.*,
  192 F. App'x 378 (6th Cir. 2006) ..........................................................................................21

**Statutes**

29 U.S.C. § 216(b) ................................................................................................................10

Plaintiff Stephanie Rosales ("Rosales") worked for Defendant Equinox Holdings, Inc. ("Equinox") as a personal trainer at a *single* location—Equinox's club in Highland Park, Texas—for *less than a single* year—from April 3, 2017 until December 12, 2017.  Yet she now seeks to certify a *nationwide* collective action that would include every personal trainer who has worked for Equinox at any point since February 13, 2015 at any of the Company's 93 clubs across the United States.  But Rosales has failed to satisfy the standards for certification, under either the "lenient" standard she urges this Court to apply or the more heightened scrutiny the Court should apply here, where the parties have engaged in meaningful discovery.

Specifically, Rosales's certification bid should be denied in full for the following reasons: (1) Equinox at all times maintained express company-wide policies permitting authorized overtime and prohibiting off-the-clock work; (2) Rosales has not shown and cannot show that Equinox ever deviated from its express written policies and/or maintained a "de facto" policy or practice of requiring off-the-clock time—at best, Rosales's evidence shows, *not* that Equinox authorized or permitted her to engage in work, but that she made a personal choice to be present at the club in order to grow her own business and client base; (3) the evidence confirms not only that Rosales was paid for all hours worked but, in many cases, at a rate significantly exceeding 1.5 times her regular hourly rate—regardless of whether she worked more than 40 hours in a week; (4) the nature of Rosales's allegations requires an inherently individualized inquiry to determine liability, if any, and any such liability would be wholly dependent upon each individual's unique circumstances, including their individual compensation plan, work schedule (which, for Equinox's personal training employees, is largely set by each individual trainer themselves), "Tier" or training ability level, client base, goals and abilities, productivity and motivation, record of work hours, and geographic location; (5) Rosales has only identified two opt-in Plaintiffs interested in joining this

lawsuit—Guy Seaman and Kendall Harper, one of whom (Harper) has only signed a generic, form declaration; and (6) neither Rosales nor opt-in Plaintiff Seaman have any evidence of their alleged unpaid overtime or off-the-clock hours, and in fact both concede as much.  Without a common, illegal policy or practice for which Equinox can be held liable, and no identifiable nexus binding the potential claims of the putative class, if any, the predominance of highly individualized analyses requires that Rosales's motion for conditional certification be denied.  Permitting her suit to proceed on a collective basis would neither promote judicial efficiency nor provide the benefit to the parties traditionally attained through collective treatment of claims.

But even if the Court determines that Rosales has met her burden and that conditional certification is appropriate (it should not), any such collective should be limited to the personal trainers at Equinox's Highland Park club.  This is the sole club at which Rosales and the opt-in Plaintiffs were scheduled to work during their employment, it is the sole club at which Rosales and the opt-in Plaintiffs trained clients, and it is the sole club whose policies and practices Rosales and the opt-in Plaintiffs are familiar with—indeed, neither Rosales nor the opt-in Plaintiffs even know the identities of the managers at any of Equinox's other clubs.  For this reason, to the extent Rosales can demonstrate the requisite commonalty and similarity necessary to permit certification of her putative collective (she cannot), it would be only as to the Highland Park club.

## I.   FACTUAL BACKGROUND

### A.   Equinox's Business.

Equinox is the preeminent fitness company in the U.S. today, offering a full service wellness experience and integrated approach to fitness.  (App. 153, Declaration of Michael Laird ("Laird Decl.") ¶ 3; App. 165, Decl. Ex. A.)  Within Equinox's portfolio of fitness brands, Equinox maintains 93 clubs across the country (and additional clubs in Canada and the United Kingdom).

(App. 153, Laird Decl. ¶ 4.)  In addition to Equinox's "basic services" like strength training, cardio training, and group fitness classes, Equinox also provides specialized programs and services, including "personal training."  (App. 153, Laird Decl. ¶ 3; App. 165, Decl. Ex. A.)  In line with this, Equinox employs personal trainers to provide personalized attention, professional instruction, and exercise programming to the Company's members to maximize the members' health, fitness, and wellness goals while providing the highest level of customer service.  (App. 155, Laird Decl. ¶ 10; App. 204-205, Decl. Ex. B.)

**B.**    **Personal Trainers' Activities.**

Equinox's personal trainers perform a number of functions for which they are compensated.  (App. 155, Laird Decl. ¶ 11; App. 207, Decl. Ex. C.)  At the outset of their employment, *i.e.*, the "ramping period," personal trainers are scheduled to work on the gym floor. (App. 155, Laird Decl. ¶ 12; App. 209, Decl. Ex D.)  During their floor shifts, depending on the motivation level of each individual trainer to interact and prospect with potential new clients, personal trainers can spend their floor shift hours passing out towels, racking weights, and ensuring that the gym floor is clean, or, in the case of more motivated trainers, interact with the club's members and serve as a spotter if necessary.  (App. 43, Deposition of Stephanie Rosales ("Rosales Dep.") at 39:2-9.)  New personal trainers are scheduled to work approximately 20 hours per week on the floor.  (App. 155, Laird Decl. ¶ 12.)  After they develop a client base, which can take several months or longer depending on the trainer, the personal trainers are taken off the floor schedule. (App. 155, Laird Decl. ¶ 12; App. 209, Decl. Ex. D.)  Once a trainer has developed a sufficient client base to be removed from the floor schedule, personal trainers spend most of their work time training clients and preparing for upcoming training sessions.  (App. 155, Laird Decl. ¶ 12; App. 209, Decl. Ex. D.)  The ultimate goal for a new personal trainer is to build up a client base where

the trainer is able to schedule at least 42 training sessions per pay period (or 21 training sessions per week) so that the personal trainer no longer needs floor shift hours to fill her schedule.  (App. 155, Laird Decl. ¶ 12.)

Throughout their employment, personal trainers meet with new members and conduct Equifit sessions, which is Equinox's version of a diagnostic fitness assessment.  (App. 155, Laird Decl. ¶ 13; App. 45, Rosales Dep. at 41:1-14; App. 45, Deposition of Guy Seaman ("Seaman Dep.") at 34:18-25.)  Personal trainers also provide new members with a complimentary training session.  (App. 155, Laird Decl. ¶ 13.)  Equinox pays personal trainers for both of these activities. (App. 156, Laird Decl. ¶ 15; App. 211-215, Ex. E.)

Equinox encourages its personal trainers to continue their education so they can provide top-level programming to their clients.  (App. 158, Laird Decl. ¶ 14.)  To that end, Equinox provides in-house education to its personal trainers through the Equinox Fitness Training Institute ("EFTI").  (App. 158, Laird Decl. ¶ 14; App. 29-30, Rosales Dep. at 25:15-26:1.)  The EFTI personal training courses are complimentary, and personal trainers are compensated for the time they spend taking them.  (App. 158, Laird Decl. ¶¶ 14, 15.)

Equinox also schedules monthly PT Forums—one-hour meetings where the club's personal training managers update the personal trainers on recent club developments and activities. (App. 30, Rosales Dep. at 26:2-11; App. 109-110, Seaman Dep. at 28:22-29:10.)  The personal training managers also frequently schedule one-on-one meetings with the personal trainers.  (App. 30, Rosales Dep. at 26:2-11; App. 109-110, Seaman Dep. at 28:22-29:10.)  Equinox compensates personal trainers for their time spent at the PT forums and in the manager meetings.  (App. 30, Rosales Dep. at 26:2-11; App. 108-110, Seaman Dep. at 28:22-29:10.)

It is Equinox's policy to pay its employees, including personal trainers, for all hours worked.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)

**C.      Equinox's Compensation And Work Schedule Policies For Personal Trainers.**

Equinox's Compensation Plan for Personal Trainers (in non-California markets)[1] explains that personal trainers' "income potential is dependent on several factors, including Tier status and productivity."  (App. 156, Laird Decl. ¶¶ 15-16; App. 211-215, Decl. Ex. E.)  There are five "training tiers" designating the seniority of the trainer and corresponding to different compensation rates (Tiers 1, 2, 3, 3+ and Tier X Coach).  (App. 156, Laird Decl. ¶¶ 15-16; App. 211-215, Decl. Ex. E.)  As a personal trainer progresses through the Tier-system, they are able to charge more for their personal training services and earn greater compensation.  (App. 156, Laird Decl. ¶¶ 15-16; App. 211-215, Decl. Ex. E.)  Personal trainers' total compensation is calculated by combining their hourly wages, flat rates for certain set activities (e.g., Equifits, complementary personal training sessions, purchased personal training sessions), and productivity bonuses.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  Accordingly, compensation among personal trainers varies greatly depending upon their Tier, the number of Equifits, complimentary personal training sessions, and purchased personal training sessions they complete, and their geographical location. (App. 156-57, Laird Decl. ¶¶ 15-18; App. 211-215, Decl. Ex. E.)

**1.      Personal Trainer Hourly Wages.**

In terms of hourly wages, personal trainers earn "set hourly wage[s] for all time" spent on "non-[Personal Training] session related activities," including scheduled floor shifts and time spent attending meetings, trainings, and CPR certification classes.  (App. 156, Laird Decl. ¶ 15;

---

[1] The fact that Equinox maintains a separate Compensation Plan for personal trainers in California markets, and in turn Equinox's California trainers are subject to a different compensation scheme than the one relevant here, further supports the denial of Rosales's bid for conditional certification of a nationwide collective because there is no common, nationwide compensation policy.

App. 211-215, Decl. Ex. E.)  Rosales, for instance, who began her employment with Equinox as a "Tier 1" trainer, earned an hourly wage of $8.00 for floor shifts and attending required meetings, trainings and CPR classes.  (Pl.'s Motion, Ex. G.)

**2.      Personal Trainer Flat Rates.**

Personal trainers at Equinox also earn set, flat rates for Equifits, complimentary personal training sessions, and purchased personal training sessions.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  For purchased personal training sessions, personal trainers earn a set, flat rate—dependent upon their "Tier"—for each personal training session they conduct.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  The session rate includes activities associated with the session that may be performed before, during, or after the actual training session.[2]  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  A "Tier 1" personal trainer, for example, will earn $26.00 for each one hour, one-on-one personal training session if they conduct less than 42 personal training sessions per pay period, or $31.00 per one hour, one-on-one personal training session if they conduct more than 42 personal training sessions per pay period.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  By comparison, the $26.00 personal training session rate more than triples Rosales's hourly rate of $8.00.  (Pl.'s Motion, Ex. G.)  Accordingly, a personal trainer would have to show that they spent more than an hour before and more than an hour after a personal training session performing session-related activities, something Rosales confirmed she did not do, for the session rate not to compensate them for all of their time worked.  (App. 47, Rosales Dep. at 43:4-23.)

---

[2] Although the personal training session flat rate includes compensation for time spent on "session related activities" that may be performed outside of the actual training session, Equinox advises that "T1-T3 Trainers should spend no more than two (2) hours per pay period on session related activities," but if more than two hours is needed, personal trainers should "address [it] with their [manager]," and the personal trainer's "pay will be adjusted" as needed.  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)

In addition to the purchased personal training session flat rate, personal trainers during the relevant time period also earned a $15.00 flat rate for "each Equifit and Complimentary PT Session given with membership and renewals." (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.) These flat rates, being higher than the hourly wages, motivate trainers to build a book of business and conduct more training sessions so that they do not have to perform lower paying hourly-wage tasks like floor shifts. (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)

### 3.   Personal Trainer Bonuses.

The final component of Equinox's personal trainers' compensation is bonuses. Equinox makes several potential bonuses available to personal trainers, including monthly and annual productivity bonuses (based on the number of completed personal training sessions), a Client Retention Bonus of $500 for every 200 paid sessions a trainer conducts with the same client, a First Time Buyer Bonus "for the initial purchase of training by a first time buyer," a Ramper Bonus Opportunity (paid on a trainer's anniversaries of 60, 90, and 120 days from hire based on varying productivity goals), a Member Referral Bonus of $50 "for every member referral that results in the sale of a paid membership," and a Personal Trainer Employee Referral Bonus" for referring another personal trainer that is hired and maintains employment for six months. (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)

In sum, the annual income potential for personal trainers, taking into account the hourly wages, flat rates, and bonuses, ranges from $38,475 for a "Tier 1" personal trainer who conducts 95 personal training sessions per month, to $160,320 for a "Tier X Coach" personal trainer who conducts 160 personal training sessions per month. (App. 156-157, Laird Decl. ¶¶ 15, 18; App. 211-215, Decl. Ex. E.)

4.      **Timekeeping Policies.**

Equinox requires its personal trainers to accurately record all of the hours that they work. (App. 155, 157, Laird Decl. ¶¶ 11, 19; App. 207, Decl. Ex. C.)  Personal trainers record their worktime for each above-referenced activity either through clocking into Equinox's digital timekeeping system, UltiPro, (for floor hours, EFTI, mentor responsibilities, monthly PT Forums, one-on-one meetings with managers, and "special events"), or by receiving a "voucher" for set, scheduled sessions (for paid personal training sessions, complimentary personal training sessions, and Equifits).  (App. 155, 157, Laird Decl. ¶¶ 11, 20; App. 207, Decl. Ex. C.)  Personal trainers are required to input and log all personal training session "vouchers" through an Equinox application on the personal trainers' phones or tablets.  (App. 30-31, Rosales Dep. at 26:15-27:14.)

With such individualized schedules and compensation, Equinox relies on personal trainers to accurately self-report their time and work-related activities.  As explained in the Company's Employee Handbook, all personal trainers are expected to accurately report all hours of work, and any "misuse of the timing system (including, without limitation, failure to use the hand clock to record your hours, altering or falsifying time records or clocking-in or out for another employee) is prohibited and grounds for immediate termination of employment."  (App. 153, 157, Laird Decl. ¶¶ 3, 21; App. 173, Decl. Ex. A.)  Importantly, personal trainers "are strictly prohibited from working off the clock" and from working "overtime unless it is authorized."  (App. 153, 157, Laird Decl. ¶¶ 3, 22; App. 173, Decl. Ex. A.)

D.      **Rosales's Employment With Equinox.**

Rosales worked as a personal trainer for Equinox at the Company's Highland Park, Texas club from April 3, 2017 through December 12, 2017.  (App. 11-12, Rosales Dep. at 7:20-8:2.)  She

was hired as a "Tier 1 personal trainer," but eventually graduated to a "Tier 2 personal trainer" by the time she voluntarily resigned from her employment.  (App. 21, Rosales Dep. at 17:1-9.)

Rosales, like other inexperienced "Tier 1" personal trainers at the Highland Park club, was originally scheduled to work around 20 floor shift hours per week to both fill her schedule until she was able to schedule more personal training sessions and give her an opportunity to meet and mingle with potential personal training clients.  (App. 155, Laird Decl. ¶ 12.)  Rosales quickly developed a large client base and was removed from the floor schedule within her ramping period. (App. 60, Rosales Dep. at 56:11-15.)

## E.      Seaman's Employment With Equinox.[3]

Like Rosales, opt-in Plaintiff Seaman also worked as a personal trainer for Equinox at the Highland Park club, but from August 31, 2016 until he voluntarily resigned on September 17, 2017. (App. 93-94, Seaman Dep. at 12:25-13:5.)  Seaman was hired as a "Tier 1" trainer but was a "Tier 2" trainer at the time of his separation.  (App. 133, Seaman Dep. at 52:8-10.)  Seaman, like Rosales, also earned $8.00 per hour for his hourly wages, including floor shift hours.  (App. 129, Seaman Dep. at 48:1-25.)  According to Seaman, he quickly ramped up personal training sessions and was removed from the floor shift schedule by the end of February 2017—six months after being hired.  (App. 124, Seaman Dep. at 43:10-16.)

## II.      ARGUMENT & AUTHORITIES

### A.      Legal Standard.

While the decision to allow a Fair Labor Standards Act (FLSA) claim to proceed as a collective action is discretionary, the Supreme Court has cautioned courts about "the potential for

---

[3] Notably, Rosales and opt-in Plaintiff Seaman have not offered any evidence pertaining to the employment of the other opt-in Plaintiff, Kendall Harper.  Indeed, all that has been offered regarding Harper is a form declaration identical to those offered by Rosales and Seaman.  (Pl.'s Motion, Ex. E).

misuse of the class device." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174 (1989).

Contrary to implications in Rosales's Motion, rubberstamping a motion for conditional

certification does not comport with *Hoffmann-La Roche's* policy of preventing the "misuse of the

class device." *Id.* Rather, conditional certification is not automatic, and, in fact, when the parties

have conducted certification-related discovery, as here, conditional certification is subject to a

heightened standard.

### 1.    Conditional Certification Is Not Automatic.

An FLSA plaintiff may obtain conditional certification and notice only by showing that

she and all others in the putative class are "similarly situated." 29 U.S.C. § 216(b).  Section 216(b)

does not define "similarly situated," nor has the Fifth Circuit adopted a specific test for certifying

a collective in a § 216(b) action. *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 518-

19 (5th Cir. 2010).  Like most federal courts, though, courts in the Fifth Circuit follow the two-

stage process outlined in *Lusardi v. Xerox Corporation*, 118 F.R.D. 351 (D.N.J. 1987).  *See Pedigo

v. 3003 S. Lamar, LLP*, 666 F. Supp. 2d 693, 696 (W.D. Tex. 2009).  The first step of the analysis

involves whether notice should be given to potential class members, using a lenient standard to

evaluate whether there are "some identifiable facts or legal nexus [that] binds the claims so that

hearing the cases together promotes judicial efficiency." *Walker v. Honghua Am., LLC*, 870 F.

Supp. 2d 462, 465 (S.D. Tex. 2012).  The second stage occurs after discovery is largely complete

and the defendant moves to decertify the conditionally certified collective. *Id.* at 466.  The court

in this latter stage applies a heightened standard to make a factual determination, based on

evidentiary submissions, whether there are similarly situated employees. *Coca v. Big Bang

Enters.*, No. 4:14-2122, 2015 U.S. Dist. LEXIS 187223, at *22 (S.D. Tex. Apr. 14, 2015).

Under either standard, however, to prevail, Rosales must show that the putative class is "similarly situated with respect to their job requirements and with regard to their pay provisions . . . [and that] there is a demonstrated similarity among the individual situations." *Id.* at *23 (citations omitted).  For the more lenient, first-stage standard, courts typically interpret this to require at least "substantial allegations that the putative class members were together victims of a single decision, policy or plan" that violated the FLSA.  *H&R Block v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999).  By contrast, the more stringent, second-stage standard requires a heightened evidentiary standard, *Coca*, 2015 U. Dist. LEXIS 1877223, at *24, in which the plaintiff must submit "more than the minimal showing of a reasonable basis" for her assertions, and "more than the plaintiff's own allegations and declarations."  *Barnes v. Abandonment Consulting Servs.*, No. 4:12-cv-01399, 2013 U.S. Dist. LEXIS 105702, at *4 (S.D. Tex. July 26, 2013).  Certification should be denied in either scenario "if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice."  *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010).

## 2.     The Stricter Second-Stage Analysis Applies Because Substantial Discovery Has Occurred.

Where, as here, the parties have already conducted certification-related discovery, the more demanding second-stage standard applies at the conditional certification stage such that the court considers the evidence submitted and imposes a higher burden upon the plaintiff.  *See Nieddu v. Lifetime Fitness, Inc.*, 977 F. Supp. 2d 686, 692 (S.D. Tex. 2013) (heightened standard applied where the parties engaged in discovery for three months, including depositions and the exchange of documents); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 U.S. Dist. LEXIS 12441, at *4 (E.D. La. July 2, 2004) ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should

certify this matter."). This Court should therefore "not accept the substance of [Rosales's] affidavits or depositions over that submitted by [Equinox]," but instead examine "the evidence to determine whether it is appropriate to certify a class of [personal trainers] to litigate" their off-the-clock claims. *Aguirre v. SBC Communs., Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 17259, at *28 (S.D. Tex. Mar. 12, 2007) (imposing a heightened standard at the first-step of conditional certification because the parties had "conducted much more discovery than is usually available at the first step of the two-step analysis").

In the year since Rosales filed this case, the parties have exchanged and responded to written discovery requests, including producing more than 700 pages of documents (roughly 429 from Equinox and almost 300 from Rosales and the opt-in Plaintiffs). (App. 3, Declaration of Talley Parker ("Parker Decl.") ¶ 6.) Indeed, the parties have exchanged initial disclosures, Equinox has responded to interrogatories, requests for production, and requests for admissions, and Rosales and the two opt-in Plaintiffs have responded to requests for production. (App. 3, Parker Decl. ¶ 6.) Additionally, Equinox has deposed Rosales and opt-in Plaintiff Seaman. (App. 3, Parker Decl. ¶ 6.) Simply put, "discovery is largely complete," *Arceneaux v. Fitness Connection Option Holdings, LLC*, No. 4:16-cv-3418, 2017 U.S. Dist. LEXIS 194840, at *5 (S.D. Tex. Nov. 28, 2017), and Rosales, having been allowed "the opportunity to gather more than just 'minimal evidence,'" must now present "more than minimal evidence." *Barnes*, 2013 U.S. Dist. LEXIS 105702, at *10.[4]

---

[4] Rosales relies, in part, on three nearly identical declarations from herself and two opt-in Plaintiffs to meet her evidentiary burden. Courts, however, disfavor boilerplate, attorney-drafted declarations, and the cookie-cutter nature of these declarations weighs against certification. *See, e.g., Tussing v. Quality Res., Inc.*, No. 8:08-cv-1833-T-26AEP, 2009 U.S. Dist. LEXIS 110190, at *7 (M.D. Fla. Nov. 25, 2009) (denying conditional certification in part because the "Plaintiffs' affidavits are largely the same affidavit signed by six different employees"); *Postiglione v. Crossmark, Inc.*, No. 11-960, 2012 U.S. Dist. LEXIS 163615, at *13 (E.D. Pa. Nov. 15, 2012) (denying conditional certification because, among other reasons, the "affirmations seem to be derived from forms and not to have been individually drafted for the employees signing them"); *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 707 (N.D. Tex. 2008) (denying certification where plaintiffs submitted five virtually identical statements containing conclusory allegations);

Although it is Equinox's position that the heightened second stage standard applies, Rosales's Motion fails under either burden.  By its very nature, Rosales's class theory requires the fact-finder to review the distinct circumstances surrounding each collective action member's claim—how many floor shifts each individual worked versus the number of personal training sessions they conducted, what Tier they had achieved, and where they were located geographically, to name only a few of the relevant individualized factors.  Particularly given the cookie-cutter nature of the allegations and the purported opt-in Plaintiff "support" for her motion, Rosales has failed to make "substantial allegations" or a factual showing that the putative class is "similarly situated" or the "victims of a common plan or policy" by Equinox that violated the FLSA.  For this and other reasons described below, Rosales's Motion should be denied.

**B.**      **Rosales Has Not Identified A Common Policy Or Plan That Violates The FLSA.**

At all relevant times, Equinox has maintained clear, facially-valid policies on time-keeping and compensation for personal trainers.  Any failure on the part of a particular personal trainer to follow these policies creates an individualized issue that defeats conditional certification.

**1.**      **Equinox's Lawful Policies Require Personal Trainers To Accurately Record All Hours Worked.**

Potential plaintiffs must show that they were victims of a common policy or scheme or plan that *violated the law* in order to satisfy the "similarly situated" standard.  *See Coca*, 2015 U.S. Dist. LEXIS 187223, at *24; *Torres v. CSK Auto, Inc.*, No. EP-03-CA-113(KC), 2003 U.S. Dist. LEXIS 25092, at *5 (W.D. Tex. Dec. 17, 2003).  Where the alleged unlawful policy does not, as a matter of course, result in a violation of the FLSA, making "individualized inquiries to establish liability" necessary, this factor "weigh[s] against a finding that the opt in claimants are 'similarly

---

*Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1234 n.22 (S.D. Ala. 2008) ("[D]eclarations are far more helpful and enlightening to the extent they are molded and personalized to the circumstances of the individual declarant, rather than amounting to a signature on a generic mass-produced form drafted by counsel.").

situated.'" *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 631-32 (S.D. Cal. 2014). Here, the evidence overwhelmingly shows the existence of only *legal* common policies.

Equinox's clear written policies expressly permit authorized overtime and forbid working off the clock. (App. 153, 157, Laird Decl. ¶¶ 3, 22; App. 173, Decl. Ex. A.) There is no corporate policy that prevents Equinox personal trainers from recording paid personal training sessions, complimentary personal training sessions, or Equifits, time spent on work activities for which personal trainers are paid at their hourly rates, or overtime hours, and there is no allegation that Equinox's timekeeping system systematically excluded work time or that managers deleted work time from employees' time records. Rather, Equinox requires personal trainers to report accurately all hours worked, as expressly evidenced in its employment policies. (App. 153, Laird Decl. ¶ 3; App. 173, Decl. Ex. A.)

During their new hire orientation, personal trainers are instructed that they must be familiar with and comply with these policies. (App. 153, 157, Laird Decl. ¶¶ 3, 23; App. 173, Decl. Ex. A.) Equinox employees are authorized to track their own hours and are responsible for self-reporting all compensable work hours, and it is Equinox's policy that any failure to report fully all compensable work time may result in discipline, up to and including termination of employment. (App. 153, 157, Laird Decl. ¶¶ 3, 19, 21; App. 173, Decl. Ex. A.) *See Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1326-27 (5th Cir. 1972) (holding that where an employer requires employees to record their hours and the employer does not know or have reason to know that an employee's reporting is inaccurate, the employee is estopped from claiming she worked more hours than she recorded and the employer is not liable for unrecorded hours).

Moreover, Rosales concedes that she self-reported her own time, and that she made sure to accurately self-report in order to be paid: "Everything that was input, I was paid for, . . . so if I

didn't put it in, I wouldn't get paid, so I made sure of that."  (App. 31-32, Rosales Dep. at 27:23-28:1.)  She cannot demonstrate a common policy or plan by Equinox to deny her or the putative collective proper compensation when Equinox indisputably paid her according to the work and hours she self-reported.  "Where there is evidence that employers have, and enforce, appropriate pay policies, that evidence weighs strongly against conditional certification."  *Nieddu*, 977 F. Supp. 2d at 703.

### 2. There Is No Evidence Of A Common "De Facto" Policy Or Practice That Violated The Law.

Because Equinox's policies necessarily comply with the FLSA, so long as the personal trainers accurately report all of their hours of work, it follows, then, that the only way Rosales can establish an unlawful policy or plan is by showing that Equinox systematically encourages or permits personal trainers to work without accurately recording their time.  Put differently, Rosales must show that Equinox had a common, "de facto" policy or practice of encouraging and allowing personal trainers to work without recording, or inaccurately recording their time—in violation of Equinox's express written policies permitting overtime and prohibiting off-the-clock work.  But Rosales has not (and cannot) produce any evidence that Equinox has had in the past or now has a decision, policy, practice, or plan to compel personal trainers to work off the clock.

### a. There is no evidence of any alleged "de facto" policy or practice common to the putative class.

Even accepting Rosales's conclusory allegation that "Defendant instructed its personal trainers to 'spend as much time as possible in the club,'" the uncontroverted evidence fails to establish that this was a policy or practice *common* to the putative class.  (Pl.'s Motion at 2.)  The only evidentiary support Rosales offers for this allegation are copies of Equinox's Highland Park club Onboarding Schedules from "Monday, July 7th" and "Tuesday, May 9th", wherein one of the

listed "Week 1 Expectations" is that the personal trainers going through new-hire orientation "[s]pend as much time as possible in the club."  (Pl.'s Motion, Ex. F.)  As an initial matter, there is nothing in this statement that indicates that this time should not be accurately recorded, as required by Equinox policy.  But in addition, the fact that this statement is lifted from only the first week of an onboarding schedule specific to the Highland Park club (and noticeably absent from "Week 2 Expectations" and "Week 3 Expectations") cannot be ignored.  *Id.*  If a requirement for personal trainers to "[s]pend as much time as possible in the club" is limited to *one week* out of three weeks of onboarding at *one* location, then the "policy," to the extent such an isolated statement can even be called that, cannot possibly be "common" to all putative class members.  At best, the statement reflects only guidance given to personal trainers going through the first week of onboarding at the Highland Park club.

Moreover, when Rosales and opt-in Plaintiff Seaman attempted to clarify this alleged "de facto" policy at their depositions, each explained that any direction or instruction to "[s]pend as much time as possible in the club" came from their managers at Equinox's Highland Park club, "Mike and Katie."  (App. 59, Rosales Dep. at 55:21-25; App. 111, Seaman Dep. at 30:21-24.)  But the personal trainer managers at the Highland Park club, and specifically "Mike and Katie," manage the trainers at their club and only their club.  (App. 154, Laird Decl. ¶¶ 6-9.)  Neither Rosales nor Seaman provide *any* evidence that this direction or instruction was accompanied by any direction or instruction—from "Mike and Katie" or anyone else—that their time spent in the club should not be recorded, or should be inaccurately recorded, in contravention of Equinox policy, and thus there is no basis to believe that Rosales or Seaman spent any time in the Highland Park club off the clock.  But even if this lone instruction supporting Rosales's allegations could be deemed sufficient as the requisite "de facto" common policy or practice necessary to support

conditional certification (it cannot), neither Rosales nor Seaman have provided any evidence that this alleged policy extended beyond "Mike and Katie"—the fitness and personal training managers at the Highland Park club, who manage the trainers *only* at that location.

Neither Rosales nor Seaman provide any evidence that "Mike and Katie" had purview over other clubs (indeed, they did not). Nor could Rosales or Seaman credibly assert that "Mike and Katie's" alleged instruction was similar or common to clubs other than Highland Park. Rosales and Seaman concede that they never worked or conducted training sessions at any Equinox club other than Highland Park (App. 55, Rosales Dep. at 51:14-25; App. 131, Seaman Dep. at 50:1-17), nor, notably, did they know who the managers were of any clubs other than the Highland Park club. (App. 131, Seaman Dep. at 50:18-23.) If Rosales and Seaman want to allege that Equinox had a national "de facto" policy directly contrary to the express written company policies, then certainly they must produce some evidence that the alleged "de facto" policy extended beyond their individualized and personal experiences. Without more, their location, geographic, and manager-specific "policy" is far too individualized to constitute a policy *common* to *any* class, let alone the proposed national class.[5]

> **b.     There is no evidence that any alleged "de facto" policy or practice violated the FLSA.**

Importantly, even if the out-of-context remark from the Highland Park managers, "[s]pend as much time as possible in the club," constitutes some sort of company-wide policy, plan, or instruction, it is not an *illegal* policy or one which violates the FLSA.

---

[5] Even if the Court grants Rosales's Motion and agrees to issue notice, for the reasons explained in this section, notice must be limited to personal trainers at the Highland Park club. While Equinox asserts that no notice should issue due to the overwhelming individualized issues and lack of common policies, in the least, there is no evidence to support Rosales's current request for a nationwide class of trainers.

Being told to be "present," if true, is not akin to being instructed to work off the clock, to not report all time worked, or that any requests for overtime will be denied.  *See, e.g.*, *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-cv-00738, 2012 U.S. Dist. LEXIS 12911, at *19-20 (S.D. Tex. Feb. 2, 2012) ("Of key significance, most Plaintiffs provide no evidence that their supervisors actually told them that they must perform work off the clock, nor . . . of any rejected request for overtime pay."); *Brumbelow*, 462 F.2d at 1327 (dismissing off-the-clock claim where the plaintiff was not directed by her supervisor to perform such work).  Rather, the only way to conclude that the instruction, "[s]pend as much time as possible in the club," is illegal, is to *assume* there is more to the instruction—like, for instance, "spend as much time as possible in the club *and don't record your time doing so*," or, "spend as much time as possible in the club *off the clock and when you're not scheduled to be working*," or, "spend as much time as possible in the club *and don't record any hours over 40 hours per week*,"  or, "spend as much time as possible in the club *and violate company policy while you do it*."  As previously discussed, Equinox's company policies permit authorized overtime and prohibit off-the-clock time, and Equinox is entitled to rely upon its employees to comply with those policies and to assume the employees were honest.  *See Von Friewalde v. Boeing Aerospace Ops., Inc.*, 339 F. App'x 448, 459 (5th Cir. 2009) ("[A]n employee has a duty to notify his employer when he is working extra hours.  Further, it is undisputed that all of [Defendant's] employees were aware of its policy prohibiting overtime work without authorization, and we have expressly rejected the notion that an employer does 'not have the right to require an employee to adhere to its procedures for claiming overtime.'").  The only reasonable, factually supported conclusion to draw from the alleged instruction, then, is that personal trainers were told to spend as much time as possible in the club in a manner that complies with company

policy. And this is not illegal, nor does it support Rosales's allegation of off-the-clock work, let alone routine off-the-clock work common to her putative nationwide collective.

"Mere presence at the workplace does not require compensation if the employee freely chooses to put in additional time as a matter of personal preference or convenience." *Lamon v. City of Shawnee, Kan.*, 972 F.2d 1145, 1158 (10th Cir. 1992) (citation omitted). Indeed, Rosales has offered no evidence that Equinox's supervisors directed her not to record all hours worked or that the instruction to be present somehow meant, or was accompanied with another instruction to, be present without clocking-in. What remains is a bare-bones, out-of-context assertion left to individual interpretation which, without more, cannot justify conditional certification.

### c.   Any non-compliance is the result of personal, individual decisions not to comply with Equinox's policies.

Without evidence of an explicit direction to violate company policy, the evidence suggests instead that Rosales and opt-in Plaintiffs Seaman and Harper made personal, individual choices to be present at the Highland Park club outside of work hours and without clocking in.

Both Rosales and Seaman admit that company policies permit overtime with prior management approval and prohibit off-the-clock work. (App. 57, 58, 59, Rosales Dep. at 53:19-24, 54:16-20, 55:6-13; App. 144, Seaman Dep. at 63:8-19.) Similarly, both Rosales and Seaman concede that they received and reviewed Equinox's Employee Handbook, containing the company's policies on overtime and off-the-clock work, and that they were trained on the Handbook or portions thereof at least during their onboarding if not throughout their employment. (App. 24, Rosales Dep. at 20:12-22:2; App. 104, Seaman Dep. 23:1-24.) Nevertheless, Rosales and Seaman both claim to have worked off-the-clock hours—in violation of the policies they received, reviewed, were trained on, and were otherwise aware of—by simply "being present" at the club for periods of time without clocking into Equinox's timekeeping system. (App. 42,

Rosales Dep. at 38:2-40:5; App. 123, 125, Seaman Dep. at 42:18-24, 44:1-3.)  Rosales and Seaman justify these off-the-clock hours by claiming they were told by management to remain present and visible at the club (App. 59, Rosales Dep. at 55:21-25; Pl. Motion, Ex. E), but the evidence and their deposition testimony suggest instead that any motivation for working off the clock was for their personal convenience or an individualized choice.

Equinox's compensation scheme is based on the idea that personal trainers start out their employment working more floor shift hours (at a lower hourly rate), so that they can begin to build up their client base until they eventually no longer work floor shifts and instead spend their time conducting personal training sessions (paid at a flat rate that is typically three times higher than the hourly rate and double the hourly overtime rate).  (App. 60, Rosales Dep. at 56:11-15; App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  As Rosales explained, her decision to be present at Equinox while not clocked in was driven by her personal desire to "be salesy," to connect with Equinox members in an effort to build her client base.  (App. 43, Rosales Dep. at 39:14-40:5.) And since more clients meant more personal training sessions, which meant exponentially higher compensation, Rosales's efforts to grow her client base are traceable to efforts to increase her own personal compensation.  Similarly, Seaman explained that "to be present," because the "gym is like a fishbowl," was one of his "tips on how to build [a] personal training department."  (App. 111, Seaman Dep. at 30:19-22 ("I also gave *my* tips on how to build your personal training department, and that was to be present."); App. 128, Seaman Dep. at 47:2, 47:11-13 ("I wanted to work hard . . . . *So were there a lot of trainers who weren't working as many hours as you were? Oh, yea.*") (emphasis added).)  It follows, then, that Rosales and Seaman's time spent "being present" but unrecorded were personal choices on their parts—ones that were not made by "a lot of trainers in the Highland Park club other than Rosales and Seaman.

Moreover, a personal choice is not a policy, and a personal decision to be present at the workplace before or after scheduled time does not violate the law. *See, e.g.*, *Lamon*, 972 F.2d at 1158 ("Mere presence at the workplace does not require compensation if the employee freely chooses to put in additional time as a matter of personal preference or convenience") (citation omitted)); *Lindow v. United States*, 738 F.2d 1057, 1061 n.3 (9th Cir. 1984); *Cherup v. Pittsburgh Plate Glass Co.*, 350 F. Supp. 386, 391 (W.D.W. Va. 1972) ("[T]he voluntariness of the employees in reporting early, satisfies this Court that it would be inequitable to impose liability [under the FLSA] on this defendant.").  Nor, more relevantly for purposes of the motion before the Court, does the personal choice to be present lend itself to collective adjudication, as it necessarily requires an individualized analysis of each personal trainer's choices in this regard and thus cannot be imparted to a nationwide class.

### d.    Courts deny conditional certification in similar cases.

Conditional certification is denied in cases such as this where the employer's undisputed policy requires employees to self-report hours worked accurately and the company correctly pays the employees for the time self-reported.  *See Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378, 380-81 (6th Cir. 2006) ("[T]he employee bears some responsibility for the proper implementation of the FLSA's overtime provisions.  An employer cannot satisfy an obligation that it has no reason to think exists.").  Not only is there no evidence here that personal trainers other than Rosales and Seaman (or, at most, outside of the Highland Park club) worked off-the-clock hours, there is no evidence that Equinox knew that personal trainers were working any such hours without complying with Equinox policy to accurately record all hours worked.  *See, e.g.*, *Carey v. 24 Hour Fitness USA, Inc.*, Civ. A. No. H-10-2009, 2012 U.S. Dist. LEXIS 146471, at *10 (S.D.

Tex. Oct. 11, 2012) (denying conditional certification because an inquiry regarding whether accurate hours were recorded would "require significant individualized inquiry and analysis.").

## C.   The Putative Class Is Not Similarly Situated And The Required Inquiry Is Individualized.

### 1.   The Substantial Individual Liability Determinations Render Collective Treatment Unmanageable.

The need to engage in a "highly individualized inquiry" to make a determination on liability justifies "refus[ing] to conditionally certify a [collective] class." *Harris v. Fee Transp. Servs., Inc.*, No. 3:05-cv-0077-P, 2006 U.S. Dist. LEXIS 51437, at *5 (N.D. Tex. May 15, 2006); *accord Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804 (N.D. Ill. 2010) ("[A] collective action is oxymoronic . . . where proof regarding each individual plaintiff is required to show liability.").

Because the Court's role at this stage is to screen unmanageable or judicially inefficient classes, the Court should deny Rosales's motion for conditional certification here, where anecdotal testimony is required to determine liability as opposed to the ability of a few plaintiffs to provide representative testimony. *See Hoffmann-La Roche*, 493 U.S. at 170-72 (explaining that courts have "managerial responsibility" to assure "efficient resolution in one proceeding of common issues of law and fact").

### 2.   Any Inquiry Into Unpaid Overtime Or Off-The-Clock Work Is Inherently Individualized.

That permitting Rosales's case to proceed on a collective basis would be unmanageable and judicially inefficient is made clear by the entirely individualized analysis that would be required to determine for each personal trainer any alleged unpaid overtime and/or off-the-clock work.

To determine whether a personal trainer was paid overtime hours, the Court must initially review each personal trainer's payroll records and work schedules to determine whether the

personal trainer worked more than 40 hours in a workweek, and if so, whether the personal trainer received pay at 1.5 times the regular rate of pay for any such hours over 40.  This analysis would inevitably vary by person, by week, and by time period.  Indeed, Rosales and Seaman themselves vary significantly with respect to their alleged hours worked.  Rosales testified, for example, that she sometimes worked "80 hours a week," but other times averaged 55 hours per week.  (App. 64-65, Rosales Dep. at 60:8-61:5.)  By comparison, Seaman testified that he ranged from 55 to 75 hours per week.  (App. 125, Seaman Dep. at 44:4-10.)  More importantly, the evidence suggests not many personal trainers work overtime hours at all—Seaman himself testified strongly that "a lot of trainers" "weren't working as many hours" as he contends he was, and that, on average, other trainers worked "maybe 30 or less" hours a week.  (App. 128, Seaman Dep. at 47:11-19 ("So were there a lot of trainers who weren't working as many hours as you were?  *Oh, yea*.") (emphasis added).)

The individualized nature of the inquiry is made all the clearer when taking into account the compensation scheme employed by Equinox for personal trainers.  Rosales cites in her Motion, for instance, that her payroll records "clearly establish" that she worked overtime hours without receiving 1.5 times her regular rate.  (Pl.'s Motion at 2-3 n.1; Pl.'s Motion, Ex. G.)  But in none of the cited examples did Rosales work more than 40 regular hours in a week (or more than 80 regular hours in a pay period).  (Pl.'s Motion, Ex. G.)  Assuming any personal training sessions, EFTI, or Equifit "Units" listed on the submitted payroll records represent *additional* hours to the regular hours, also assuming that each "Unit" is equivalent to an hour of time,[6] and assuming further that those "Unit" hours, when combined with the regular hours, brought Rosales's weekly totals over

---

[6] Personal training session rates vary by the length of session, as well as whether the session is private or "duet" (co-taught).  (App. 156, Laird Decl. ¶ 15; App. 211-215, Decl. Ex. E.)  Rosales confirmed at deposition that almost all of her personal training sessions lasted one hour.  (App. 46, Rosales Dep. at 42:24-43:3.)

40 hours per week, the compensation Rosales received for these alleged overtime "Unit" hours still exceeds 1.5 times her regular hourly rate of $8.00. *Id.* Her compensation of $26.00 per "PT Session," for example, is more than double 1.5 times her hourly rate for this work.

And this analysis is only more complicated when it is performed across a group of personal trainers whose schedules, rates of pay, and actual work performed vary tremendously. For example, an experienced "Tier 3+" trainer spends their time primarily conducting personal training sessions, at a much higher rate of up to $62.00 for each session, with little to no EFTIs, Equifits, and floor shift hours. By contrast, a newly-hired "Tier 1" trainer mostly works floor shift hours with very few personal training sessions paid at a lower rate (i.e., $26 per session), and may also be working for a second employer. The complexity of each personal trainer's individualized analysis is, itself, an independent reason justifying the denial of certification. *See Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 U.S. Dist. LEXIS 44259, at *22 (S.D. Tex. Aug. 17, 2005) (decertifying the collective and dismissing the opt-in plaintiffs after finding the plaintiffs were not "similarly situated" in part because of "[t]he complexity of individualized claims . . . [wa]s only exacerbated by the variety of methods by which Plaintiffs were paid").

Determining potential liability for any alleged off-the-clock time is similarly an individualized inquiry. As a threshold matter, Rosales and Seaman do not even agree or allege consistently *what* constituted their off-the-clock time. Rosales, for instance, claims her off-the-clock time constituted "gap time" when she stayed at the Highland Park club between floor shifts and personal training sessions, as well as "[m]aybe 20 percent" of the Equifits she taught (even though she concedes she knew she was supposed to clock-in for Equifits). (App. 45, 46, 52, Rosales Dep. at 41:15-17, 42:10-12, 48:3-22.) Seaman, by comparison, claims his uncompensated time constituted "free sessions," time spent creating client programs, "picking up weights," time

spent being "visible," and the time spent before and after each personal training session.  (App. 118, 122-23, Seaman Dep. at 35:4-11, 41:6-42:11.)

Moreover, Equinox's complex compensation scheme again exacerbates the individualized nature of these off-the-clock claims.  *See Johnson*, 2005 U.S. Dist. LEXIS 44259, at *22  Taking Rosales's "gap time" claim, for instance, the inquiry necessary to determine liability on this front varies both between persons and for the same individual.  As between personal trainers, a "Tier 1" personal trainer with more floor hours than personal training sessions will have more "gap time" between their floor hours and personal training sessions and between separate personal training sessions than a "Tier 3+" personal trainer with hardly any floor hours and mostly personal training sessions.  And even one, individual personal trainer can have largely varying "gap times" depending on their schedule, and would need to demonstrate that they actually performed work, of which Equinox was aware, during this time.  Rosales testified that at times during her employment there were four-hour or two-hour gaps, or even no gap at all, between her floor shifts. (App. 35-36, Rosales Dep. at 31:9-32:24.)  Ultimately, the crux of Rosales and Seaman's claims about unpaid overtime and off-the-clock time depend on widely varying, highly individualized facts.

**3.     Neither Rosales Nor Seaman Can Offer Evidence Of Their Alleged Unpaid Overtime Or Off-The-Clock Hours To Determine Liability.**

Even if the Court were to undertake individualized analyses of each personal trainer's alleged off-the-clock time or unpaid overtime, both Rosales and Seaman admit that they cannot recall how many off-the-clock hours they worked in any workweeks, that there is no record of their off-the-clock time, and similarly, that they can only estimate or *guess* how many total hours they may have worked.  (App. 51, 64, Rosales Dep. at 47:6-15, 60:8-61:5 ("I cannot say . . . I'm just taking a guess."); App. 119-120, 125, Seaman Dep. at 38:8-39:1, 44:4-21 ("Some months it

was a lot.  If I were going to put a middle number, I don't know.").)  This means that there is no way to reconstruct the alleged off-the-clock time or unpaid overtime to any degree of reasonable certainty or credibility, and further, that there is no representative evidence of off-the-clock work hours or unpaid overtime for the putative class.  It follows, then, that determining whether there is any liability for off-the-clock time and unpaid overtime is not only a highly individualized inquiry, but impossible without evidence of the same.

In sum, Rosales has failed to demonstrate, even under a lenient standard, that Equinox uses a common policy or practice to deny personal trainers overtime or require off-the-clock work.  In this case, there is no identifiable nexus that binds the potential claims of the putative class such that hearing the claims collectively would promote fairness and judicial efficiency.  Rather, the individualized inquiries stemming from the personalized circumstances of each putative class member would substantially eliminate the judicial efficiency, and resulting benefit to the parties, traditionally attained through collective treatment of claims.  As a result, conditional certification is not warranted.

### D. Rosales Lacks Support For Her Lawsuit.

It is settled law that FLSA claims may not proceed as a collective action unless the plaintiff first shows that similarly situated individuals exist *and* that they "want to opt-in to the lawsuit." *Carey*, 2012 U.S. Dist. LEXIS 146471, at *8 ("[T]ypically a showing is necessary that at least a few similarly situated individuals seek to join the lawsuit.").  This is a threshold requirement.  If the plaintiff fails to satisfy it, certification is improper.  *See Rodgers v. CVS Pharmacy, Inc.*, No. 8:05-cv-770-T-27MSS, 2006 U.S. Dist. LEXIS 23272, at *8 (M.D. Fla. Mar. 23, 2006) ("Certification of a collective action . . . is not appropriate to determine *whether* there are others

who desire to join the lawsuit . . . . Rather, a showing that others desire to opt-in is required before certification and notice will be authorized by the court.") (citation omitted).

Although Rosales asserts that "multiple individuals have already self-selected as similarly situated and elected to join this suit," Pl.'s Motion at 2, only two individuals have shown actual interest in joining this suit, and both of them worked exclusively at Equinox's Highland Park club. This is remarkable given that this suit has been pending for over a year. Without more interest from "similarly situated" personal trainers to join this litigation, this Court should not put Equinox "through the expense and effort of notice to a conditionally certified class of claimants in a collective action." *Carey*, 2012 U.S. Dist. LEXIS 1467471, at *3 (denying conditional certification).

**E.**     **In The Event The Court Grants Rosales's Motion, It Should Reject The Proposed Notice.**

Even if the Court grants Rosales's Motion and agrees to issue notice in this case, it should do so only as to the Highland Park location, and it should reject Rosales's proposed notice and correct its deficiencies. The notice proposed by Rosales is inappropriate on several grounds.

First, the header on the document is misleading. Rosales's proposed header, "If you worked for Equinox Holdings, Inc. as a Personal Trainer, you may be entitled to unpaid overtime wages," implies not only that wages have not been paid, but the alleged unpaid hours were overtime. The title should be revised to read: "Notice of Pending Lawsuit Under the Fair Labor Standards Act."

Second, Rosales's proposed notice does not provide a full or accurate description of Equinox's position and the defenses it asserts, and it fails to notify putative collective action members of their potential responsibility to share in liability for payment of costs.

Third, the Court should deny Rosales's request to set a proposed notice period of 60 days and instead set a notice period of 30 days.  Although courts in the Fifth Circuit will approve opt-in periods between 30 and 120 days from the date of mailing, the 60-day opt-in period here is unreasonably long.  This case has been pending for a year already, Rosales has made no showing that the putative class will be difficult to contact because of their locations or otherwise, and there are no extenuating factors warranting additional time.

Fourth, Rosales's request for alternative methods of notice (other than delivery by mail to home addresses) is unnecessary, unduly burdensome, and not likely to facilitate notice in this case. Courts should only allow methods of notice in addition to the preferred method of first-class mail when first-class mail is shown to be insufficient.  *In re Wells Fargo Wage & Hour Empl. Practices Litig.*, No. H-1102266, 2013 U.S. Dist. LEXIS 70040, at *6 (S.D. Tex. May 17, 2013). Specifically, the Court should deny Rosales's request that Equinox disclose "*email addresses, and telephone numbers* of Potential Plaintiffs within seven days from entry of an Order," and that Equinox "post the Notice and Consent forms at [its] facilities that employ Personal Trainers." (Pl.'s Motion at 9.)  Because Rosales has not made any showing that home addresses are ineffective or inadequate for facilitating notice, there is no need for email addresses or phone numbers in addition to home addresses.  Similarly, the provision of email addresses could increase the risk of distorting the court-approved notice, since it can easily be altered and forwarded to unintended recipients.  *See In re Wells Fargo*, 2013 U.S. Dist. LEXIS 70040, at *7.  Also, posting the notices at Equinox's facilities would be "overly intrusive" as the postings would merely supplement the mailed notices and would only provide notice to currently employed personal trainers.  *Id.* at *7-8.

Finally, Equinox should have at least 14 days after the entry of an Order to disclose identifying information for putative class members.  Seven days is an unreasonable turn-around time and imposes an undue burden on Equinox.

Thus, Equinox submits that if the Court conditionally certifies a collective in this case, the Court should do so only as to the Highland Park location, and it should reject Rosales's proposed notice and either correct its deficiencies or require the parties to meet and confer on a revised form of the notice.

### III.   CONCLUSION

Rosales's theory of liability guarantees that any collective action would devolve into a series of mini-trials.  For this reason, combined with the lack of interest from other class members in joining this case, Rosales has failed to carry her burden, and Rosales's Motion should be denied. Even if the Court does certify a collective (which it should not), the Court should do so only as to the personal trainers at Equinox's Highland Park club.

Respectfully submitted,

/s/ Talley R. Parker
Talley R. Parker
Texas State Bar No. 24065872
talley.parker@jacksonlewis.com
Ethan J. Davis
Texas Bar No. 24107748
ethan.Davis@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
(214) 520-2400
(214) 520-2008

**ATTORNEYS FOR DEFENDANT
EQUINOX HOLDINGS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing brief was served upon the attorneys of record in the above cause in accordance with Rule 5 of the Federal Rules of Civil Procedure on this 28th day of March 2019.

/s/ Talley R. Parker
Talley R. Parker